R. M. STEWART, Appellant, *v.* JOHN SEVERANCE *et al.*, Respondents.

1. *Execution — Judgment — Mistake of clerk in describing date of in execution.* Where an execution recited that it was in pursuance of a judgment rendered on the 13th day of September, 1860, when the judgment on which the execution was actually issued was rendered on the day preceding: held, that such mistake of the clerk in describing the judgment did not invalidate the sale and annul the proceedings.

2. *Execution — Actions not founded on record — Variance in execution.* — Where a matter of fact is the foundation of the action, and matter of record is only the inducement thereto, a variance in the execution in the description of the record is not material, unless so great as to amount to a strong probability that the record cannot be the writing described.

3. *Execution — Variance — Misprision of clerk.* — Where the variance between the judgment and the execution is owing to the misprision of the clerk, and is merely formal, the variance is amendable and may be disregarded by the court. But where there was not simply a mistake or error, but a total non-compliance with the statute, the rule is otherwise.

4. *Execution — Sale of land at third term from date of, of what force — Construction of Statute.* — Where an execution was made returnable to the June term, 1864, and certain land was levied upon in the meantime, but by order of plaintiff no sale was made at the June or September term, but at the December term the same was sold under the original execution, without any new levy, the execution merely reciting the previous levy: held, that under the act of 1863 (Sess. Acts 1863, p. 20), the execution continued in force, and the sale was valid.

5. *Execution Sale — Conspiracy to depress bidding.* — Defendants have the unquestioned right to agree among themselves that at the execution sale they will bid an amount sufficient to save themselves harmless from liability, and the sale should stand, notwithstanding it may have inured greatly to their benefit, unless it be shown that there was a conspiracy to depress the bidding.

6. *Fraud — Burden of Proof — Judicial Sales — Collusion.* — It is incumbent on the party alleging fraud to prove it; but every circumstance conducing to show its existence is admissible. Courts, from considerations of policy, are inclined to uphold judicial sales, but this policy will not go so far as to sustain them where they have been conducted with bad faith and collusion.

7. *Execution — Sale — Purchaser — False representations.* — If the purchaser at an execution sale falsely appeal to the benevolence of the bidders by giving out that he is buying for the benefit of the debtor or his family, this will be a circumstance which, in conjunction with slight evidence, may be sufficient to justify a court in setting aside a sale as fraudulent. The same effect would follow when the declarations were made privately, and persons who would otherwise have attended for the purpose of purchasing are kept away in consequence thereof. But it would be necessary to show by some evidence that this result followed.

8. *Sales — Declarations of by-standers.*— The declarations of by-standers at a public sale are proper to be received in evidence, not only because they form a part of the *res gestæ* which show how the purchasers' professions had affected the bidding, but also because the slightest circumstances are admissible in questions of fraud.

## *Appeal from Fifth District Court.*

This was an action to set aside an execution sale of plaintiff's land. At the sale the property was purchased by defendants. It appears that the clerk of the Buchanan Court of Common Pleas, on the 28th day of May, 1864, issued from his office an execution reciting that Russell H. Wrinkle, in his lifetime, " on the 13th day of September, 1860," recovered a judgment in said court, against Robert M. Stewart and others, for $3,798.40 and costs ; that the execution was delivered, on the 31st day of May, 1861, to the sheriff of Buchanan county, who levied on the property in said execution mentioned, prior to the June term, 1864, but sold the same on the 20th day of December, 1864.

The petition averred, among other things, that, before said sale, defendants, for the purpose of purchasing said property for less than it was worth, and for the purpose of cheating and defrauding plaintiff, agreed with each other that they would not bid against each other at said sale, and that they would purchase the property for their joint benefit; that they would represent to purchasers at said sale that they were purchasing for the benefit of plaintiff, and that, after they were repaid for their outlay out of the proceeds of said property, they intended to convey the balance of the property to plaintiff, and that said property should be bid off in the names of defendants Severance and Robert Stewart; that plaintiff had no knowledge or notice of this agreement before said sale ; that he was at the time absent from the State ; that it was agreed that defendant Carter should bid in said property as the representative of defendants, but should bid in the name of defendants Severance and Stewart, at certain nominal prices, and that said nominal prices were agreed upon between defendants before the sale; that in pursuance of said arrangements between said defendants, defendant Carter did bid for said property in the name of Severance and Stewart, and caused the

same to be struck off to them, and for a nominal price; that said defendants made known and stated to various persons and bidders, or persons who desired to bid at said sale, and who were there present for that purpose, that they (the defendants) intended to bid in the property, to be sold for the benefit of plaintiff, and that they would make it bring the amount of the execution, and that after they were reimbursed for their outlay they would hold the balance for the benefit of plaintiff.

The petition charges that, in consequence of said representations made by defendants as aforesaid, persons who desired to bid for said property at said sale were prevented from so doing; that, as a result, defendant Carter bid in all of said property at merely nominal prices, and for one-tenth its real value, in the name of Severance and Stewart; that the property was sold for $5,488.50, whilst the same was worth $60,000; that after the sale, by a fraudulent arrangement between defendants, the sheriff's return was made to show that the property was struck off to and bought by defendants Severance and Weakley. The petition charges that said acts of defendants were and are a fraud upon his rights, and that said sale should be set aside, and prays a decree for that purpose, and for an account, etc., and for all proper relief.

Defendants answered, admitting the clerical misstatement of the date of the judgment in the execution, but denying most of plaintiff's allegations.

At the June term of said Common Pleas Court for 1868 this cause was tried by the court, and judgment was rendered for defendants, and plaintiff's petition was dismissed. The case went up to the Fifth District Court, where it was affirmed, and comes here by appeal.

Further facts appear in the opinion of the court.

*Strong & Chandler*, and *Hall & Oliver*, for appellant.

I. Courts of equity will grant relief upon the ground of fraud, established by presumptive evidence, which evidence courts of law would not always deem sufficient proof to justify a verdict at law. (1 Sto. Eq. § 190; Chesterfield v. Jansen, 2 Ves. 155–156.)

A positive fraud may be committed by creating a false impression. (1 Sto. Eq. § 192, note 5; 2 Wheat. 178–192; 6 Ves. 605.) A false impression may be created as well by acts as words. (1 Sto. Eq. § 192, and note 2; 3 Blackst. Com. 165; 2 Kent's Com. 484; 2 Wheat. 195.) A sale will be deemed fraudulent and will be set aside where there was any collusion or contrivance to enable the purchaser to obtain the property below its value. (1 Sto. Eq. § 29, notes 1, 2; 20 Mo. 294; Jones v. Caswell, 3 Johns. Cas. 29; Doolen v. Ward, 6 Johns. 194; Howard v. Castle, 6 T. R. 642; 3 Ves. 619, 623–4; 1 Paige, 147; 4 Johns. Ch. 119; 1 Watts, 163; 2 Washb. Real Prop. 176–9; 1 Lead. Cas. Eq. 562; 25 Mo. 309; 27 Mo. 119; 25 Ill. 176; 13 Penn., 1 Harris, 516–17.)

II. Where the price for which land was sold was greatly inadequate, the court will scan the proceedings narrowly, and will require a strict regularity in the proceedings of sale. (23 Mo. 12, 13, 14, 22; 3 Monr. 273–5; 1 Sto. Eq. 246, note 1.)

III. The execution under which the sale was made was unsupported by a judgment. Said execution, not reciting the date of the judgment, was absolutely void. Our present statute is different from that of 1825 in the matter of the execution reciting the date of the judgment, showing that the Legislature in making the change regarded the recitation as essential. (Stat. 1825, p. 363, § 2; Gen. Stat. 1865, p. 640, § 2.) The execution must recite the day on which the judgment was rendered. (16 Mo. 495; 7 Conn. 6; 2 Tuck. Com. 330.) The well-established rule is, that a sheriff's deed must contain recitals required by the statutes. (18 Mo. 580; 36 Mo. 121.) Statutes prescribing forms of proceedings or modes of proof are strictly construed. (Sedg. on Stat. 319; Davison v. Gill, 1 East. 64.)

IV. The execution under which the sale of plaintiff's property was made was dead at the time of sale. (Gen. Stat. 1865, p. 646, § 51; Sess. Acts 1863, p. 2, §§ 1–3.) The sale not having been made at the June or return term of the court, the execution was continued in force until the September term, but after that term it was dead; and sale made at the December term, 1864, being the third term after issue of execution, was void. (36 Mo.

115–24 ; 37 Mo. 194.) An execution in this State has no validity except what is imparted to it by statute. The General Assembly having taken up the subject and legislated upon it, the common law is entirely superseded. (3 Mo. 333 ; 16 Mo. 543–7 ; 10 Mass. 39 ; 1 Met. 130 ; 3 Comst. 9 ; Sedg. Stat. 94 ; 20 U. S. Dig. p. 13, § 19 ; 21 U. S. Dig. p. 11, §§ 16–19 ; 19 U. S. Dig. p. 12, §§ 3–6.)

V. The court erred in excluding the evidence of John Stewart in relation to the question asked about statements of certain Irishmen at the sale. Such statements were, apart from the *res gestæ*, declarations made at the time the act was done, which they were intended to characterize, and which they were well calculated to unfold the nature and quality of, and to explain as a part of the *res gestæ*. (10 Mo. 772 ; 3 Conn. 250 ; 3 Ind. 522 ; 3 Phil. Ev. 228.) If what was said at the time of the sale constituted a part of the *res gestæ*, it is not necessary that the declaration be proven by the speaker. (3 Phil. Ev. 228 ; 11 Pick. 469.) Where a person's acts are admissible, what he said at the time about his acts is also admissible. (3 Phil. Ev. 213, 210 ; 1 Greenl. Ev. § 108, n. 1, 2 ; *id.* p. 148, n. 3 ; Phelps v. Foot, 1 Conn. 387 ; 2 Hill, 259 ; 12 Wend. 45.)

*Vories & Vories*, and *Bassett, Lawson & Van Waters*, for respondents.

I. Parol evidence may explain a discrepancy between the judgment and execution. If the error is amendable, it will be disregarded in equity. (8 Blackf. 179 ; 4 Blackf. 263 ; 6 Ohio St. 255 ; 8 Ohio St. 128 ; 9 U. S. Dig. 27 ; Gwynne on Sheriffs, 337, 354–75 ; 5 Cow. 529 ; 4 Wend. 585 ; 10 Johns. 381 ; 9 Cow. 182 ; Brown v. Betts, 13 Wend. 30 ; Jackson v. Walker, 4 Wend. 462 ; 15 Me. 64 ; Webster *et al.* v. Blount *et al.*, 39 Mo. 500 ; Iowa Dig. 449 ; 3 Green, Iowa, 385 ; 8 Wend. 676 ; 18 Johns. 96 ; 28 Ill. 264 ; 10 Ohio 434 ; Gen. Stat. 1865, p. 570, § 5.)

II. If the sheriff does not comply with the directions of the statute, it will not avoid a deed in the hands of a purchaser. (4 Wend. 463 ; 39 Mo. 500 ; Chase v. Gillman, 15 Me. 64.)

III. A combination of interest between different persons to purchase property at a sheriff's sale is not necessarily corrupt. It is the end to be accomplished which makes such a combination lawful or otherwise. If it be to depress the price of the property by artifice, the purchase will be void; if it be to raise the means of payment by contribution, it will be valid. (1 Watts & Serg. 136; 10 Watts, 313; 3 Met., Mass., 384; 11 Paige, 431; Wheat. Dig., Supplement, 1865, p. 303, §§ 239–241.)

IV. The execution in this case was not void because there was no sale at the June or September term of the court in 1864. The act of plaintiff caused the first execution to be suspended by appealing said cause to the Supreme Court, said appeal being a *supersedeas*. The judgment of the court being affirmed upon said appeal, the present *venditioni exponas*, or execution reciting the former levy, as is provided for in section 1, act of 1863, p. 20, was issued, returnable to the June term, 1864. The testimony of Severance, as to an arrangement made by plaintiff in this suit to have no sale made at the June term, 1864, although hearsay testimony, was received without objection. It shows that it was for the accommodation of plaintiff, and the indorsement of the sheriff upon the execution corroborates the fact. Section 51, page 646, of the Gen. Stat. 1865, relied upon by plaintiff, has nothing to do with this case. The sale was in December, 1864, and is governed by session acts of 1863, p. 20, sections 1, 2. Under this act, when a levy has been made under a valid and subsisting execution, and if from any cause the real estate shall not be sold at the next term of the court from which said execution has issued, said execution and lien of said levy shall remain and continue in full force until a term of court is held in the county where said property can or may be sold. (Bank of the State v. Bray, 37 Mo. 194.) The case of Lackey v. Lubke, 36 Mo. 115, relied upon by plaintiff, cannot apply to this case. The sale of property in that case was before the session acts of 1863. It was made under the statute of 1855. This statute only continued the execution to the end of the second term. (R. C. 1855, p. 748, § 54.) The session acts of 1863 changed the law in this respect. Plaintiff assumes that courts of equity

will grant relief upon grounds of fraud established by presumptive evidence, which evidence courts of law would not always deem sufficient proof to justify a verdict at law, and cites 1 Sto. Eq. Jur. § 190. This doctrine in the next section is condemned by the author.

WAGNER, Judge, delivered the opinion of the court.

The first objection which will be noticed in this case is the variance between the execution and the judgment, and which, it is insisted by the counsel for the appellant, constitutes a fatal defect. The execution under which the sale was made recited that it was in pursuance of a judgment rendered in the Buchanan Court of Common Pleas, on the 13th day of September, 1860, when it is admitted that there was no judgment of that date, but that the judgment on which the execution was actually issued was rendered on the 12th day of September, 1860. The difference was obviously a clerical mistake or misprision; but no matter how it occurred, the question is whether it can be disregarded, or whether it must be held to destroy the authority of the sheriff and invalidate the sale. The statutes of this State have inserted the general form of an execution, and declared what recitations shall be contained therein, one of which is that the day of the rendition of the judgment shall be given. (Gen. Stat. 1865, ch. 166, § 2.) But whether these recitations are all to be considered as matters of substance, and therefore strictly indispensable, or whether some of them may be held as merely directory, so that an immaterial variance will not vitiate them, and may be disregarded, is a question of some difficulty.

A question somewhat similar arose in the case of Tanner v. Stine, 18 Mo. 580, and the judge who delivered the opinion of the court examined the authorities on the subject with much care and research. That was a case where a sheriff's deed was drawn in controversy, and the recitations in the deed were that the land was exposed to sale, " at the court-house door, in the city of St. Louis, during the —— term of the —— court of ——, for the year eighteen hundred and forty——," and the deed was decided to be void. In that case, it will be observed, there was not sim-

Stewart v. Severance et al.

ply a mistake or error, but there was a total non-compliance with the statute. The thirty-eighth section of the act of 1835 concerning executions enacted that, when real estate should be taken in execution, it should be the duty of the officer to expose the same for sale at the court-house door, on some day during the term of the Circuit Court for the county where the same was situated, having previously given twenty days' notice of the time and place of sale. The forty-fifth section of the same act made it the duty of the officer who should sell any real estate to make to the purchaser a deed, to be paid for by the purchaser, reciting the names of the parties to the execution, the date when issued, date of the judgment, and other particulars, as recited in the execution; also a description of the property, the time, place, and manner of sale, which recital should be received as evidence of the facts therein stated. The court, in the opinion delivered, after noticing the fact that the Ohio statute requires the recitals of the judgments and executions, and various matters of form which in no wise can affect the sale for good or for evil, so far as the debtor or purchaser is concerned, remarks: "Our statute goes further, and not only requires the recital of the authority to sell, but also of the performance of other acts which were necessary to make a valid sale. It requires that a sheriff's sale shall be made during the term of the Circuit Court. This was for an obviously wise purpose. The deed must recite the time, place, and manner of sale, and the recital of these facts in the deed is made the evidence that the law has been complied with. It was contemplated that the deed, upon the face of it, should show that the sale had been made at such a time as the law supposes would produce the most beneficial result. The recital of the mere day of sale would not satisfy the law, without showing that the day was during the term of the Circuit Court. This has been the uniform practice in this State. Then, without undertaking to say what recitals are directory and what essential, we may safely declare that the recital of the enumerated facts, the non-performance of which would render the sale void, is necessary." It will be perceived that in the above case the court did not deem itself called upon to draw the line of distinction between what might

properly be called directory, and essential recitals. The record did not demand it. The law required that the sale should be made at a term of the court, and while the court was in session. This was done from motives of public policy, to insure an attendance of bidders, and for the joint benefit of the debtor and creditor. A sale at any other time than that designated by the statute would undoubtedly be void.

The case of Cutter v. Wadsworth, 7 Conn. 6, is greatly relied on by the appellant. In that case an execution counted on a judgment rendered by the superior court, on the fourth Tuesday of February, and the record showed a judgment rendered by that court on the second Tuesday of February; and it appeared that the court commenced its session on the second Tuesday, which was the day prescribed by the law for the holding of the court, and continued in session without interruption until after the fourth Tuesday, and that the judgment was in fact rendered on an intermediate day between the second and fourth Tuesday: it was held that the execution was void, and that the officer to whom it was committed was not bound to execute it. But when this decision was made, the old rule of the common law prevailed, that in contemplation of law the court was considered as being held on the day of the term when it began, and that all judgments and proceedings dated from that time. Upon this view the execution described an impossible judgment, for there was no term of the court in session at the time designated. Our statute has changed this rule, and requires the judgment to be described according to the true date of the month when rendered.

In Smith v. Ewbanks, 9 Tenn. 20, it was held that where matter of fact is the foundation of the action, and matter of record is only the inducement thereto, a slight variance in the description of the record is not fatal. In Bank of Whitehall v. Pettis, 13 Vermont, 395, an officer was held liable for not enforcing an execution reciting a judgment truly, but by mistake of the clerk dated the 13th of June, 1809, instead of the 13th of June, 1839. In Liebig v. Rawson, 1 Scam. 272, and in Hull v. Blaisdell, 1 Scam. 332, it was decided that where a record is not the foundation of the action, a variance is not material, unless so great as

to amount to a strong probability that it cannot be the writing described. Where the variance between the judgment and the execution is owing to the misprision of the clerk, and is merely formal, the variance is amendable, and may be disregarded by the court. (Doe v. Rue, 4 Blackf. 263 ; Jackson v. Walker, 4 Wend. 463 ; Brown v. Belts, 13 Wend. 30.)

In the case at bar there is no doubt but that every requisite of the statute was performed and complied with. There was a valid judgment which authorized the sale, the deed contains the statutory recitals, and the slight mistake of one day by the clerk in describing the judgment ought not to be permitted to invalidate the sale and annul the proceedings. The case of Tanner v. Stine I regard as good authority, and the doctrine therein laid down is not in the least impugned by the ruling adopted here.

It is further contended that at the time the sale was made by the sheriff the execution had spent its force, and was *functus officio*, and that it afforded neither authority nor justification for the acts of the officer. The execution under which the property was sold was issued on the 28th day of May, 1864, and was made returnable June 13th, 1864, at the June term. By order of the plaintiff no sale was made at the June term, nor at the next succeeding September term, though the reason why does not appear. But at the December term, 1864, of the Common Pleas Court, the property was sold. The execution was issued and the sale was made while the law of 1863 was in force. (Sess. Acts 1863, p. 20.) The first section of that act provided that all executions previously issued and not satisfied in whole or in part, and all liens which had accrued in virtue of such executions, should be revived and be in full force, and that the liens should exist according to the priority of such executions until the same were satisfied ; and that, in all cases where executions had been returned not satisfied in whole or in part, it should be the duty of the clerks to issue new ones referring to the former ones ; and in case levies had been made, to recite such levies in the renewed executions, and authorize and command the officer to levy upon additional property if the former levy should be deemed insufficient to satisfy such executions ; but in case of sale of property under such execu-

tions, to first exhaust the original levy before selling any property embraced in such subsequent levy. The second section of the act declares " that executions now issued, or that hereafter may be issued, from any court of record, and levied upon real estate, if from any cause the real estate shall not be sold at the next term of the court from which said execution has issued or may hereafter be issued, said execution and the lien of said levy shall remain and continue in full force until a term of court is held in the county where said property can or may be sold."

No 'new levy was made on this execution; it was a renewed execution reciting a previous levy, in conformity with the provisions of the first section. The second section retains the lien not merely to a term of the court when the property can be sold, but when it may be sold. The law is extraordinary, but it was passed to meet extraordinary exigencies. It was adopted at a time when, in a large part of the State, court-houses were closed and civil process suspended—when officers either resigned or failed wholly to perform their duties. Another consideration was that there was either no sale for property or it went at a ruinous sacrifice, and it was deemed advisable to preserve the liens and grant some indulgence as to sales. Why the property was not sold at the September term does not appear, but from the unsettled state of the country probably good reasons existed for the delay, and the very terms of the law did not require it should be so sold.

The petition charges that at the sale of the property the defendants, for the purpose of purchasing the same at less than its value, and for the purpose of defrauding and cheating plaintiff, agreed with each other that they would not bid against each other at said sale, and they would purchase the same for their joint benefit; that they would represent to purchasers at said sale that they were purchasing for the benefit of plaintiff, and that after they were repaid for what they had expended, and indemnified to the extent of their obligations for the plaintiff as his surety, out of the proceeds of said property, they would convey the balance to plaintiff, and that the property should be bid off in the name of defendants Severance and Stewart; that plaintiff had no knowledge or notice of the agreement before the sale, and that at the time he was

absent from the State; that in pursuance of said arrangement the property was bid off to said defendants at nominal prices. Three of defendants are plaintiff's nephews. The petition further charges that defendants made known and stated to various persons and bidders, or persons who desired to bid at said sale, and who were there present for that purpose, that they intended to bid in the property to be sold for the benefit of the plaintiff, and that they would make it bring the amount of the execution, and that after they were reimbursed they would hold the balance for plaintiff's benefit; that, in consequence of said representations, persons who desired to bid for said property at said sale were prevented from doing so; that the property was sold for $5,488.50, when it was worth $60,000; and that the sale was a fraud upon his rights, and prays for a decree setting the same aside, and for an account, etc.

Defendants, in their answer, deny all the material allegations in the bill; deny that there was any combination, fraud, or misrepresentation; deny that the property was worth $60,000, and aver that it was heavily encumbered, and that they paid for it its reasonable value.

The evidence is contradictory in regard to the value of the property at the time it was sold. While some witnesses testify that it was purchased at a very great sacrifice, others state that in the depressed condition of the times it would have been difficult to get persons to bid more for it, in its then situation. I think there was no such inadequacy shown in the price as would by itself justify the presumption of fraud, though the weight of evidence is that it went low; and if the plaintiff's proof sustains the charge of any unfairness or misrepresentation on the part of the purchasers, that circumstance must be taken into consideration. The defendants Severance, Carter, and O'Donohue were securities for the plaintiff on an appeal bond, and by a decision of the court adverse to him their liability was fixed, and the property was advertised and sold to satisfy the debt out of which their suretyship grew.

The attorneys having the judgment in charge informed defendants that they must make the property sell for enough to satisfy

22—VOL. XLIII.

the debt, or they would be held responsible.   They then procured
a complete list of all plaintiff's property and agreed upon a scale
of prices which they would bid, which was just sufficient to make
the whole property — a large number of lots — pay off and dis-
charge the debt.   And although the evidence shows that there
were a few stray bids against them, it is a little remarkable that
they succeeded in getting all the property.   For the purpose of
indemnity, and saving themselves harmless from liability, they
had the unquestioned right to agree among themselves that they
would bid an amount sufficient for that purpose; and if they were
guilty of no improper conduct, or resorted to no trick or artifice
calculated to depress the price or deter bidders, the sale should
stand, notwithstanding it may have inured greatly to their benefit.
To make the transaction fraudulent it should be shown that there
was a conspiracy to depress the bidding.   It is incumbent on the
party alleging fraud to prove it, but every circumstance conducing
to show its existence is admissible.   Courts, from considerations
of policy, are inclined to uphold judicial sales; but this policy
will not go so far as to sustain them when they have been con-
ducted with bad faith and collusion.   In Neal v. Stowe, 20 Mo.
290, the sale was set aside, the evidence showing that the pur-
chaser obtained the land below 'its real value, and that persons
who desired to buy were kept away from the sale by contrivance
and misrepresentations.   So, in Stewart v. Nelson, 25 Mo. 309,
it was held that where a purchaser at a sheriff's sale practices any
deceit or imposition, or is guilty of any trick or device the object
of which is to get the property at an under-value, the sale may
be set aside in favor of the defendant in the execution.   In a very
recent case in this court it was declared to be a well-settled prin-
ciple of equity law that where a purchaser becomes such under
such circumstances or state of facts as would make it a fraud to
permit him to hold on to his bargain—as by representing that he
is buying for the benefit of the embarrassed debtor in the execu-
tion, or that he intended to reconvey the property, and thereby
obtains it at a sacrifice—the court will relieve against such fraud,
and the person who has gained an advantage by means of such
fraudulent act will be converted into a trustee for those who have

been injured thereby. (McNew v. Booth, 42 Mo. 189, and authorities cited.) There is no direct evidence in the record that persons were prevented from bidding in consequence of the representations of the defendants. It is abundantly shown, however, that the defendants used the same uniform declarations on all occasions and to everybody—that they were buying in the property to protect themselves and save something for the plaintiff (their relative), Governor Stewart.

If the purchaser at an execution sale falsely appeal to the benevolence of the bidders, by giving out that he is buying for the benefit of the debtor or his family, this will be a circumstance which, in conjunction with slight evidence, may be sufficient to justify a court in setting aside a sale as fraudulent. The same effect would follow where the declarations were made privately, and persons who would otherwise have attended for the purpose of purchasing are kept away in consequence thereof. But it would be necessary to show by some evidence that this result followed.

The case of Haines v. O'Connor, 10 Watts, 313, is cited and greatly relied on by the defendants. In that case the property of Haines was sold at sheriff's sale and bought in by O'Connor, who declared at the sale that he was buying it for Haines; and after the sale he frequently stated that if Haines or his friends would pay him his money, interest, and a judgment which he held against him, he would convey the land to the use of Haines and his family, but would not let a stranger have it. This offer was repeatedly made, till finally, after a lapse of seven years, and after property had greatly risen in value, Haines offered to treat with O'Connor on the subject, and was informed that it was too late. It was in evidence that O'Connor refused one thousand dollars for his bargain immediately after the sale; and even after Haines had left the premises and removed out of the State he offered to give up the property if his money was returned. It was therefore said on this branch of the case that O'Connor had waited long enough — that the offer came too late. But at the same time the court gave the following charge to the jury: "Have you any proof to satisfy you that any fraud or contrivance was

used by O'Connor to get this property below its value? Is there any evidence that his intention was generally known at the sale, or that even Wendt would have bid a dollar more than was bid for the property? Do you believe that the numerous creditors of the plaintiff whose claims were not covered by this sale refused to bid, in order that the property might be struck off low for the use of the plaintiff and his family? All the testimony bearing on the subject is that of one witness, who says that O'Connor said to Wendt, 'Do not bid; I am bidding in for Peter.' Was this, if said at all, said for the purpose of an artifice, with an intent to get the property at an under-price, and then refuse to let the plaintiff have it? Did he get a bargain of the property by this contrivance?"

The above questions, put to the jury in the charge of Judge Grier, are pertinent, and express the law with precision and accuracy. One of the strongest points in the case was that the plaintiff had slept on his rights till about seven years before he offered to negotiate for a redemption and reconveyance of the property, and fourteen years had actually intervened before the action was commenced for recovery. In the meantime the situation of the parties had greatly changed, and the land had vastly enhanced in price. But even then, had there been any proof of fraud or contrivance, the relief would have been furnished and the sale set aside. No such laches was exhibited here. The property of Governor Stewart was sold in December, 1864, and his petition to set the same aside, and for relief, was filed October 20, 1865. At the sale Carter did the bidding. In the course of the trial, on the examination of witnesses, John Stewart testified as follows: "I was present at the sheriff's sale of Governor Stewart's property, in December, 1864. | There were but four bidders; Carter, O'Donohue, and Allen Vories were bidders. I know there were some Irishmen there to bid; one of them asked Carter why Governor Stewart's property was selling. They did not bid either before or after this question was asked. Carter replied that Severance, O'Donohue, and myself were Governor Stewart's securities, and they were bidding in the property to save themselves and trying to save something for the Governor. After

Stewart v. Severance et al.

Carter made this statement, the man who asked the question turned around and had a conversation with the other men who were with him; there were six or seven others with him."

The plaintiff then asked the witness this question: "What did the men you refer to say after Carter had said that he and Severance were bidding off the property to save themselves as Governor Stewart's securities, and to try to save something for the Governor?" The question was objected to by defendants, and the court sustained the objection. Plaintiff then asked this further question: "Did the men you refer to say, at the time of the sale, anything about their wishing to bid for the property; and if so, what did they say?" This question was also objected to by the defendants, and the objection sustained by the court.

I am of the opinion that the questions should have been answered, and that the evidence was admissible. The declarations of the bystanders at a public sale are proper to be received in evidence, not only because they form part of the *res gestæ*, which show how the purchaser's professions had affected the bidding, but also because the slightest circumstances are admissible in questions of fraud. (Walter v. Gemant, 1 Harris, 517.) This error will necessarily lead to a reversal and remanding of the cause.

I have purposely refrained from giving any positive opinion upon the merits of the case or entering into any minute examination of the testimony, as no intelligent opinion can be arrived at until the record contains the whole evidence. I have simply contented myself with laying down the principles of law which must guide and govern the case upon a new trial, when all the testimony is in.

The judgment will be reversed and the cause remanded for further proceedings in conformity with this opinion. The other judges concur.